# AFFIDAVIT OF TASK FORCE OFFICER MICHAEL MCGEE IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Michael McGee, state:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3 Field Avenue, Methuen, Massachusetts ("**Target Premises**"), further described in Attachment A, for the things described in Attachment B.

2. Since July 2014, I have been employed as a police officer with the Manchester, New Hampshire Police Department ("MPD"). During my time at MPD, I have been a member of several specialized units, including the Anti-Crime Unit and the Gang Prevention Unit. Both units focused on deterring and apprehending violent offenders and gang members in Manchester.

3. In March 2021, I was deputized as a Task Force Officer ("TFO") for the Federal Bureau of Investigation ("FBI"), New Hampshire Major Offender Task Force ("MOTF"). The MOTF works to dismantle and disrupt criminal groups like drug trafficking organizations ("DTOs") and street gangs operating in New Hampshire and Massachusetts.

4. Throughout my law enforcement career, I have received specialized investigatory training in numerous areas, including gang investigations, drug investigations, and criminal interdiction. As of April 2017, I have also been a certified Professional Gang Investigator by the East Coast Gang Investigators Association.

5. Beyond my specialized training, I have varied experience conducting narcotics investigations. Among other things, I have conducted physical and electronic surveillance; bought drugs from drug dealers while operating as an undercover officer ("UC"); debriefed drug dealers and confidential sources ("CS"); reviewed financial, cellphone, and other records of drug

traffickers; monitored court-authorized cell-site location data and GPS trackers; and arrested numerous targets of narcotics investigations. I have also been the affiant for and executed search warrants that resulted in the successful seizure of controlled substances, including methamphetamine and fentanyl, and other evidence of narcotics trafficking, including drug proceeds, drug paraphernalia, and firearms.

6. Accordingly, I am familiar with common "tools" of the drug trade. I know the general appearance, texture, and consistency of controlled substances. I understand common slang terms used by individuals involved in drug trafficking when referring to drugs and drug prices. And I am aware of the methods generally used to package, transport, and distribute drugs.

7. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter nor is it based solely on my own personal knowledge. Rather, the information contained herein is based on my personal participation in the investigation as well as information learned from other members of the investigative team.

8. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute and possession with intent to distribute controlled substances) ("Target Offenses") have been committed by Albert Marino Fortuna Escalante ("FORTUNA"), Bresley Beatriz Castillo Taveras ("TAVERAS"), and other unknown persons. There is also probable cause to search the **Target Premises** described in Attachment A for the evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B. The applied-for warrant would authorize search of the **Target Premises** and the seizure of records, information, and tangible objects, in whatever form they are found, that constitute fruits, contraband, evidence, and

instrumentalities of violations of the Target Offenses, those violations involving FORTUNA, TAVERAS, and other unknown persons, as further described in Attachment B.

## PROBABLE CAUSE

### A. Background

9. In March 2026, MPD and the FBI MOTF cultivated a confidential source ("CS-1")[1] who disclosed that FORTUNA had been selling CS-1 drugs on a weekly basis for over 15 years. Most of that time, FORTUNA sold CS-1 "Perc 30" pills, which I know from my training and experience is street slang for oxycodone. But over the 6 months prior, FORTUNA had been pushing CS-1 to purchase methamphetamine and fentanyl.

10. According to CS-1, most drug deals with FORTUNA followed a predictable pattern. CS-1 would contact FORTUNA via the phone number (603) 234-1195 (the "1195 Dispatch Phone") to buy a quantity of drugs. FORTUNA would respond with a time and location to meet. Then, FORTUNA or a drug runner would meet with CS-1 to complete the transaction, which usually occurred in Southern New Hampshire or Northern Massachusetts.

11. The information CS-1 provided is generally consistent with law enforcement's independent knowledge of FORTUNA. For example, cooperating witnesses in other investigations conducted by MPD, FBI, and the Drug Enforcement Administration ("DEA") had previously identified FORTUNA as a large drug supplier in Massachusetts and New Hampshire. Beyond that, on May 9, 2023, New Hampshire State Police ("NHSP") pulled FORTUNA over for a traffic violation and found evidence of narcotics trafficking in his vehicle. At the time, FORTUNA was driving a white 2013 Toyota Camry (NH registration #64P12) registered to his

---

[1] CS-1 has no criminal convictions and agreed to cooperate for consideration on charges following a March 2026 arrest for drug possession in Manchester. The information CS-1 provided is generally consistent with information already known to investigators and is corroborated by other evidence discussed herein.

father, Marino Fortuna. There was one other occupant in the car, Maverick Augusto Matos Santana ("SANTANA"), who was sitting in the front passenger seat. During the stop, FORTUNA consented to a search of his person and the vehicle, which resulted in the seizure of several items that, based on my training and experience, I know are consistent with narcotics trafficking. Those items included cylindrical containers of marijuana; multiple bundles of suspected heroin/fentanyl, crack, and pills wrapped in green plastic wrap; a roll of green plastic wrap that matched the bundles; approximately $10,000 in cash; and several cellphones.

12. During the current investigation, law enforcement used two CSs and one UC to conduct nine controlled buys, which yielded seizures of approximately 2,422.11 grams of fentanyl and 879.31 grams of methamphetamine.[2] All of the controlled buys were pre-arranged by FORTUNA using three different dispatch numbers: the 1195 Dispatch Phone; (978) 853-9128 (the "9128 Dispatch Phone"); and (603) 234-3023 (the "3023 Dispatch Phone"). Generally, the CS/UC would contact FORTUNA to purchase a quantity of drugs, and FORTUNA would respond with a time and location to conduct the deal. FORTUNA had runners, *i.e.*, TAVERAS and an unknown Hispanic male, deliver the drugs on April 10th, April 22nd, and May 15th when, according to border crossing records, he was in the Dominican Republic. He completed the rest of the drug transactions himself.

13. A chart summarizing each controlled buy operation conducted throughout this investigation follows:

| **SEIZURES FROM CONTROLLED BUY OPERATIONS** |
| --- |

[2] These figures are based on presumptive drug tests performed after each seizure. All drugs were subsequently sent to the DEA laboratory ("lab") for further analysis. To date, 1,205.46 grams of fentanyl and 879.31 grams of methamphetamine have been lab-confirmed. Lab results for seizures that occurred on August 12th, August 25th, and September 9th are still pending. Of note, most of drugs seized from these controlled buys were wrapped in green plastic wrap similar to the kind that law enforcement found in FORTUNA's vehicle during the May 2023 traffic stop.

| Buy No. | Date | DEA Exh. No. | Substance Identified | Net Weight (Grams) | CS/ UC Buy | Drug Cost | Dispatch Phone No. | Courier | Approx. Meeting Location | Lab Analysis |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 03-30-26 | 1B69 | Meth (100% +/- 7% purity) | 440.6 G | CS-1 | $4,000 | 1195 Dispatch Phone | Fortuna | Charles St., Manchester, NH | DEA |
| 2 | 04-10-26 | 1B70 | Fentanyl | 196.01 G | CS-1 | $3,200 | 1195 Dispatch Phone | Taveras | 417 Cartier St., Manchester, NH | DEA |
| 3 | 04-22-26 | 1B71 | Fentanyl | 291.49 G | CS-1 | $4,000 | 1195 Dispatch Phone | Unknown Hispanic Male | 48 Henriette St., Manchester, NH | DEA |
| 4 | 05-14-26 | 1B73 | Fentanyl | 272.56 G | CS-1 | $3,500 | 1195 Dispatch Phone | Unknown Hispanic Male | 48 Henriette St., Manchester, NH | DEA |
| 5 | 05-26-26 | 1B76 | Meth (83% +/- 6% purity) | 438.71 G | CS-1 | $3,000 | 1195 Dispatch Phone | Fortuna | Oak Ridge Rd., Manchester, NH | DEA |
| 6 | 06-04-26 | 1B77 | Fentanyl | 445.4 G | CS-1 | $4,500 | 1195 Dispatch Phone | Fortuna | Theophile St., Manchester, NH | DEA |
| 7 | 08-12-26 | TBD | Pending | Pending | CS-2 | $2,500 | 9128 Dispatch Phone via WhatsApp | Fortuna | 25 Hampshire St., Salem, NH | DEA |
| 8 | 08-25-26 | TBD | Pending | Pending | CS-2 & UC | $5,500 | 9128 Dispatch Phone via WhatsApp | Fortuna | 21 Hampshire St., Salem, NH | DEA |
| 9 | 09-09-26 | TBD | Pending | Pending | UC | $5,500 | 3023 Dispatch Phone | Fortuna | 15 Vine St., Manchester, NH | DEA |

| TOTAL LAB-CONFIRMED DRUG WEIGHT | | |
|---|---|---|
| FORTUNA | TAVERAS | UNKNOWN HISPANIC MALE |
| 879.31 G Methamphetamine<br>1,205.46 G Fentanyl<br>(plus pending labs) | 196.01 G Fentanyl | 564.04 Fentanyl |

14. For each controlled buy, investigators executed the same standard protocols. Namely, investigators met with the CS/UC at a predetermined location to provide official agency funds. They searched the CS/UC and the CS/UC's vehicle for contraband, weapons, additional money, and law enforcement identifiers, finding none each time. And they provided the CS/UC with an audio/video recording transmitter. Immediately after each controlled buy, investigators met at a predetermined location for debriefing and to seize and field test the suspected drugs. Agents also reviewed audio/video that corroborated the CS/UC's version of events.

15. On October 21, 2026, FORTUNA and TAVERAS were indicted in the District of New Hampshire for the Target Offenses (26-cr-84-JL-AJ-01/02) (sealed).

16. As explained below, there is probable cause to believe that fruits, contraband, evidence, and instrumentalities of violations of the Target Offenses will be found at the **Target Premises**.

**B. Identification of the Target Premises**

17. On April 17, 2026, the Honorable United States Magistrate Judge Talesha L. Saint-Marc from the District of New Hampshire signed two warrants that allowed FBI to generally track FORTUNA's whereabouts. First, Judge Saint-Marc signed a warrant authorizing FBI to search and seize information, including cell-site location data, associated with FORTUNA's 1195 Dispatch Phone (Docket # 26-CV-155-01-tsm). Second, she signed a warrant authorizing FBI to affix a GPS tracking device to a white 2023 Mercedes GLE-Class registered to TAVERAS (NH registration #5247041) (the "white Mercedes"), which he and TAVERAS used during the first two controlled buys (Docket # 26-MJ-114-01-tsm).

18. Based on location data derived from these sources, investigators were able to identify the **Target Premises** as a location of interest. For example, at approximately 8:30 a.m. on May 20, 2026, GPS location data for the white Mercedes showed it was parked in front of 8/10 Field Avenue in Methuen, MA, which is directly across the street from the **Target Premises**. This was the fifth time investigators had observed the vehicle at this location.

19. Around 5:00 a.m. the following day, May 21, 2026, cell-site location data for FORTUNA's 1195 Dispatch Phone showed it was within 594 meters of the **Target Premises** and remained there until approximately 4:30 p.m.

20. On May 22nd, at approximately 1:37 a.m., cell-site location data for FORTUNA's 1195 Dispatch Phone showed it within 861 meters of Louis and Roosevelt Streets in Goffstown, NH. Within that radius is 119 Edmond Street in Manchester, NH, which investigators believe is

FORTUNA's stash house ("Manchester stash house").[3]

21. After leaving the vicinity of the Manchester stash house, cell-site location data for FORTUNA's 1195 Dispatch Phone showed it in the area of 1015 Elm Street in Manchester, NH. That address is listed on TAVERAS's New Hampshire driver's license and investigators have consistently seen her there with two children she shares with FORTUNA.

22. At approximately 5:00 a.m. on May 22nd, cell-site location data for FORTUNA's 1195 Dispatch Phone showed it leave Manchester and return to an area within 967 meters of the **Target Premises**. At approximately 10:30 a.m., investigators observed a white Honda CRV registered to TAVERAS (MA registration #5DRC94) (the "white CRV") parked directly across the street from the **Target Premises** at 8/10 Field Avenue.

23. After identifying Field Avenue as a location of interest, investigators installed a pole camera that overlooked the entire street.[4] Upon doing so, investigators consistently observed FORTUNA park on the side of the street in front of 8/10 Field Avenue and walk down the driveway of the **Target Premises** toward the back of the residence.

24. Below is a surveillance photograph that depicts the driveway of the **Target Premises**, which is the area where pole camera footage consistently captured FORTUNA coming and going from:

---

[3] Among other things, investigators observed the unknown Hispanic male at the Manchester stash house immediately after the controlled buy on April 22nd and immediately before and after the controlled buy on May 14th. They also observed FORTUNA at this location immediately before the controlled buys on May 26th and June 4th and immediately before an attempted controlled buy with CS-1 on June 22nd.

[4] Of note, Field Avenue is a short, dead-end road.



**C. June 4th Controlled Buy**

25. On June 4, 2026, at the direction of law enforcement, CS-1 contacted FORTUNA via his 1195 Dispatch Phone to buy 40 "sticks" (*i.e.*, 400 grams) of fentanyl for $4,500. Based on my training and experience, I know that a "stick" is drug slang for 10 grams of fentanyl. FORTUNA ultimately directed CS-1 to the "west side." Based on prior deals, CS-1 interpreted this to mean the area of 48 Henriette Street in Manchester, NH, which according to Google Maps, is 0.1 mile from FORTUNA's Manchester stash house, as shown below:




26. At approximately 10:00 p.m., investigators established surveillance in that area. Shortly thereafter, investigators observed a Hispanic male, later confirmed to be FORTUNA,

wearing a white tank top and a black cross-body satchel leave the driveway of the Manchester stash house and enter a gray Chevrolet sedan rental vehicle registered to Enterprise (TX registration #VTM5992) (the "gray Chevy").[5] According to Enterprise, it had rented the vehicle to SANTANA who, as noted above, was with FORTUNA when NHSP found evidence of narcotics trafficking during the May 2023 traffic stop.

27. I believe FORTUNA drove straight to the controlled buy because within two minutes of leaving the Manchester stash house, at approximately 9:49 p.m., investigators observed the gray Chevy pull up to the side of CS-1's vehicle. According to CS-1, FORTUNA was the sole occupant of the gray Chevy. This is corroborated by cell-site location data for FORTUNA's 1195 Dispatch Phone, which showed it in the area. CS-1 followed FORTUNA to the area of Theophile Street before getting into his vehicle where he gave CS-1 445.4 grams of hard (compressed) lab-confirmed fentanyl, as pictured here:



Before parting ways, FORTUNA asked when CS-1 would be ready for "Tina." I know from my training and experience that "Tina" is drug slang for methamphetamine.

28. After the controlled buy, cell-site location data for FORTUNA's 1195 Dispatch Phone showed several stops in Manchester before returning to the area of the **Target Premises** at

---

[5] FORTUNA was wearing a similar satchel when NHSP found evidence of narcotics trafficking in his vehicle in May 2023.

approximately 4:00 a.m., where it remained until approximately 2:30 p.m. Based on my training and experience coupled with other information obtained throughout the investigation, I suspect FORTUNA was making various stops in the middle of the night to disperse drug proceeds to be sent to the Dominican Republic.

29. Indeed, I know from my training and experience that drug trafficking generates significant amounts of illicit cash, which cannot be easily spent or deposited without drawing the attention of law enforcement and financial regulators. Thus, transforming "dirty" money into "clean" revenue that appears legitimate is a fundamental part of the drug trade. Some common methods used to accomplish this include the following: splitting large cash deposits into smaller amounts to stay under reporting thresholds; coercing individuals to mix drug proceeds into legal money-remittance services; commingling drug proceeds with cash-heavy front businesses; moving cash across borders via vehicles, ships, or couriers; using illicit funds to buy goods (such as cars and electronics) and shipping them internationally to turn sales into clean revenue; and utilizing underground banking or Asia-based Hawala networks that allow brokers to swap funds across borders without physical money crossing over by, for example, matching drug proceeds in the U.S. with legitimate buyers abroad.

30. According to CS-1, FORTUNA has a rental car business in the Dominican Republic. This information is corroborated by a Cash App account investigators identified that is associated with FORTUNA's 9128 Dispatch Phone under the vanity name "Albert Fortuna" and username "$fortunarentcars." Additionally, the iCloud account associated with FORTUNA's 9128 Dispatch Phone contained numerous Ria Money Transfer and Western Union receipts from various individuals, including TAVERAS, documenting money transfers to the Dominican Republic.

31. In the days following the June 4th controlled buy, the pole camera overlooking Field Avenue captured FORTUNA starting his day exiting the **Target Premises** and ending his day returning to the **Target Premises**. On several occasions, FORTUNA was captured going to and from the **Target Premises** in the same gray Chevy that he used to conduct the controlled buy on June 4th.

**D. iCloud Information Indicating the Target Premises is a Meeting Location for Drug Transactions**

32. On July 16, 2026, the Honorable United States Magistrate Judge Andrea K. Johnstone from the District of New Hampshire signed a warrant authorizing FBI to search and seize information associated with the Apple iCloud account linked to FORTUNA's 9128 Dispatch Phone (Docket # 26-mj-218-01-AJ).

33. Upon reviewing information associated with that account, investigators identified several text communications in which FORTUNA provided various individuals with the address for the **Target Premises**. One of those individuals was Edwin Pares ("PARES") whose number, (603) 486-8212, investigators recognized, as PARES was the target of a prior FBI investigation for drug distribution and money laundering.

34. One conversation between FORTUNA and PARES spanned from April to July of 2026. During that conversation, FORTUNA and PARES frequently went back and forth asking the other person to call them or indicating that they will be at a location at an estimated time. Based on my training and experience, I know that drug traffickers will often avoid explicitly texting about drug transactions to avoid creating a paper trail that can be used against them. I also know that when drug traffickers, including FORTUNA, send an address without further explanation, it often means that is where the recipient should go to meet for a drug transaction.

35. Starting on June 9, 2026, PARES sent FORTUNA three messages in a row in an

apparent attempt to get in touch with him. At 4:06 p.m. the following day, FORTUNA responded, "Manito it's been hard for me to even get 20 g at a right number." Based on my training and experience, I believe PARES contacted FORTUNA to buy drugs. I also believe that FORTUNA did not immediately respond because, according to his text, he was having difficulty obtaining 20 grams of an unspecified narcotic for a good price.

36. On July 1, 2026, at 2:41 p.m., PARES texted FORTUNA, "Yoo." At 6:45 p.m., FORTUNA responded, "klk manito," which I know from my training and experience is a common greeting used by Spanish speakers from the Dominican Republic. The following day, at 10:18 a.m., FORTUNA texted PARES the address for the **Target Premises**. At the time, cell-site location data for FORTUNA's 1195 Dispatch Phone showed it was in the area of the **Target Premises** and remained there until approximately 3:30 p.m. Based on my training and experience coupled with other information described herein, I believe PARES texted FORTUNA to purchase drugs. FORTUNA texted the address for the **Target Premises** because that is where he wanted to meet to complete the drug transaction. This is consistent with his pattern of communication during controlled buys and prior drug deals with CS-1.

### E. Introduction of CS-2

37. In or around June 2026, investigators cultivated a second confidential source ("CS-2")[6] who admitted to regularly contacting FORTUNA via his 9128 Dispatch Phone to buy large quantities of cocaine and fentanyl. As discussed above, this is consistent with information

[6] CS-2 agreed to cooperate in exchange for consideration of a reduced sentence on a pending charge for drug distribution. CS-2 has prior convictions for felon in possession of a dangerous weapon, violations of New Hampshire's Controlled Drug Act, driving under the influence (misdemeanor), falsifying physical evidence, a marine species regulation offense, and delivering a weapon or contraband to the jail. As described herein, the information CS-2 provided is consistent with information already known to investigators and is corroborated by other evidence.

investigators already knew about FORTUNA, namely that he was supplying large quantities of narcotics in Southern New Hampshire and Northern Massachusetts.

38. CS-2 also told investigators that FORTUNA preferred to communicate via FaceTime, which is a built-in video and audio calling service unique to Apple devices. This too is on par with what investigators already knew about FORTUNA. Since March 2026, FORTUNA had consistently called CS-1 on FaceTime for controlled buys, including on March 30th, April 10th, April 22nd, May 14th, and May 26th. I also know from my training and experience that drug traffickers often use FaceTime because the audio and video is encrypted, making it hard for law enforcement to intercept the calls.

39. CS-2 further told investigators that he had recently started communicating with FORTUNA through a WhatsApp account associated with FORTUNA's 9128 Dispatch Phone ("9128 WhatsApp account") because CS-2 no longer had an Apple device. This was corroborated by pen register and trap and trace device data for FORTUNA's 9128 WhatsApp account, which showed consistent activity. Further, I know from my training and experience that WhatsApp is often used by drug dealers due to its end-to-end encryption features.

**F. August 12th Controlled Buy**

40. On August 12, 2026, at the direction of law enforcement, CS-2 contacted FORTUNA through his 9128 WhatsApp account to buy 20 "sticks" (*i.e.*, 200 grams) of fentanyl for $2,500 for a "high-level customer" (*i.e.*, the UC). At 5:07 p.m., FORTUNA asked if CS-2 wanted "hard" or "powder." Based on my training and experience, I know that FORTUNA was referring to the physical texture and consistency of the fentanyl. CS-2 requested hard fentanyl but asked if that would take longer. FORTUNA said he would need to go to Manchester if CS-2 wanted hard, so CS-2 ultimately agreed to buy powder.

41. FORTUNA's comments to CS-2 coupled with other information described herein leads me to believe that FORTUNA had powder fentanyl at the **Target Premises** but would have to go to the Manchester stash house to obtain hard product. For example, at 6:03 p.m., after CS-2 agreed to buy powder fentanyl, FORTUNA directed CS-2 to 25 Hampshire Street in Salem, NH, which according to Google Maps, is approximately seven minutes or so from the **Target Premises** (*i.e.*, 3 Field Avenue), as shown below:




25 Hampshire Street is the same area FORTUNA sent CS-1 to during controlled buys for powder fentanyl on March 30th, May 26th, and August 25th. For controlled buys on April 22nd, May 14th, and June 4th involving hard (compressed) fentanyl, FORTUNA directed CS-1 to the area of 48 Henriette Street, which is just a three-minute walk from his Manchester stash house.

42. Pole camera footage overlooking Field Avenue showed FORTUNA leave the area of the **Target Premises** at approximately 6:47 p.m. on August 12th and drive away in a white 2011 Honda CRV (NH registration #4712019) (the "2011 Honda CRV"), as shown below:



43. I believe FORTUNA drove straight from the **Target Premises** to the controlled buy because just nine minutes later, at 6:56 p.m., he was at the meeting location. When FORTUNA arrived, he called and instructed CS-2 to follow him a short distance before directing CS-2 to park on the side of the road and get into his vehicle. FORTUNA gave CS-2 the suspected drugs, depicted below, which field tested presumptive positive for 200.55 grams of fentanyl.



The DEA lab results are still pending.

44. During the deal, FORTUNA indicated he had a contact in the "feds" who told him his name had recently been brought up. It is unclear what FORTUNA meant by this. But I know from my training and experience that it is common for drug traffickers to deploy various countersurveillance measures to protect their investments and identify law enforcement activity. These measures may include, among other things, positioning lookouts and "scouts" at strategic

locations to monitor law enforcement movement; using specialized equipment to sweep vehicles, phones, and meeting locations for hidden tracking devices, bugs, or wiretaps; and utilizing police scanners, radios, and monitors.

45. FORTUNA also told CS-2 during the August 12th controlled buy that he had two AR pistol-style firearms that he was trying to sell and asked CS-2 to help get rid of them. Based on my training and experience, drug traffickers may possess firearms as a means of protection in furtherance of their drug trafficking activities and oftentimes will store those firearms in their homes.

**G. August 25th Controlled Buy**

46. On August 25, 2026, at the direction of law enforcement, CS-2 contacted FORTUNA again on his 9128 WhatsApp account to buy 50 sticks (*i.e.*, 500 grams) of fentanyl for $5,500 for his "high-level customer" (*i.e.*, the UC). But this time, CS-2 told FORTUNA the UC wanted to cut out the middleman and go direct to him. FORTUNA eventually agreed to meet with CS-2 and the UC at 25 Hampshire Street in Salem, NH, which again, is approximately seven minutes from the **Target Premises**.

47. At approximately 6:18 p.m., CS-2 called FORTUNA to inform him they were at the meeting location. Nine minutes later, at 6:27 p.m., FORTUNA called to confirm CS-2 wanted 50 sticks and said he would be right there. At 6:41 p.m., pole camera footage overlooking Field Avenue showed FORTUNA leaving the driveway area of the **Target Premises** and entering a Gray Toyota Camry (MA registration #5PAL86) that was parked out front. I believe FORTUNA traveled straight to the controlled buy because just seven minutes later, at approximately 6:48 p.m., investigators observed FORTUNA arrive to the meeting location.

48. For about ten minutes, FORTUNA spoke with CS-2 and the UC in the parking lot

before he asked CS-2 to get into his vehicle. FORTUNA then drove to another nearby parking lot with CS-2 and provided the suspected drugs pictured below, which field tested presumptive positive for 506.65 grams of powder fentanyl:



The DEA lab results are still pending.

**H. Other Ongoing Surveillance of the Target Premises**

49. Investigators have consistently surveilled the **Target Premises** since in or around late May 2026 when it became a location of interest. To date, investigators continue to observe FORTUNA coming and going from there.

50. Of particular note, on three or four occasions, pole camera footage captured FORTUNA leaving the **Target Premises** with a suitcase. For example, below is pole camera footage of FORTUNA from June 25, 2026:



Based on border-crossing records, cell-site location data, and other surveillance, there is no indication that FORTUNA traveled during this time. I know from my training and experience that drug traffickers will often use large vessels, including suitcases, to conceal narcotics. And based on the totality of the circumstances, including evidence that FORTUNA stored and trafficked narcotics from the **Target Premises**, I believe that FORTUNA was concealing narcotics on these occasions.

## TRAINING AND EXPERIENCE CONCERNING ITEMS TO BE SEIZED

51. Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control.

52. It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such recordkeeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so that the drug traffickers can readily ascertain current balances.

53. Among other things commonly found in drug traffickers' residences are cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious

gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

54. Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (*e.g.* financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

55. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

56. Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. Again, I know that FORTUNA has used three separate phones to conduct drug transactions during this investigation: (i) the 1195 Dispatch Phone; (ii) the 9128 Dispatch Phone; and (iii) 3023 Dispatch Phone. I am also aware that items such as cell phones are often located in a residence or on an individual's person.

57. Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

58. It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as storage facilities, locked containers, cabinets, safes, safe deposit boxes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

59. In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences. It is common for these cellular telephones to be retained, although not necessarily used, for many months in the drug traffickers' vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they

switch to new cellular telephones. I am aware that my law enforcement colleagues have found collections of cell phones during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

60. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

61. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. It may also identify evidence of drug crimes in particular. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, TextNow, Signal, Facebook Messenger, and Instagram to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are cautious about law enforcement detection.

Other applications like Venmo or CashApp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

62. As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a) Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b) Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c) The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d) Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into

a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e) Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal

information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment and also can require substantial time.

f) Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

63. Based on my training and experience, I believe that it is likely that the **Target Premises** will contain smartphones that can be unlocked via the use of a fingerprint or facial recognition in lieu of a numeric or alphanumeric password. I know from my training and

experience, as well as from information found in publicly available materials including those published by Apple, that some models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint or facial recognition in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID or facial recognition.

64. If a user enables Touch ID or facial recognition on a given device, he or she can register numerous fingerprints or facial profiles that can be used to unlock that device. The user can then use any of the registered fingerprints or facial profiles to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor or by looking into the device's camera. In my training and experience, users of Apple devices that offer Touch ID or facial recognition often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

65. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID or facial recognition enabled, and a passcode must be used instead, such as: (1) when a certain amount of time has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID or facial recognition recently and the passcode or password has not been entered in the last few days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID or facial recognition exists only for a short time.

66. Although Apple's Touch ID or facial recognition may be the most common or well-known means for unlocking a device with a fingerprint or facial profile, I am aware that other brands of smartphones like Samsung also offer similar features that work essentially in the same

way. Therefore, when I refer to Touch ID or facial recognition, I am not just referring to Apple devices but also to similar technology on all smartphones. While I believe that the targets of this investigation likely use smartphones, I am not aware of the particular brand of phone that they use (although FORTUNA has used at least some Apple devices in the past, as evident by his use of Apple's FaceTime feature).

67. The passcodes that would unlock the targets' devices are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor or put the device's camera in front of the user's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints or facial profile of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

## ELECTRONIC DEVICES AND FORENSIC ANALYSIS

68. As described above and in Attachment B, this application seeks authorization to search for and seize records and information that might be found on the **Target Premises**, in whatever form they are found. One form in which the records and information might be found is data stored on an electronic device.[7] Thus, the warrant applied for would authorize the search and seizure of electronic devices and the seizure or copying of electronically stored information, all under Rule 41(e)(2)(B).

[7] For the purposes of this Affidavit, an electronic device refers to any device performing processing and/or storing data in an electronic, magnetic, or optical form. The most familiar electronic devices include computers, cellular telephones, and tablets. In addition, a non-exhaustive list of electronic devices would include removable storage like hard drives, USB drives and discs, gaming devices, wearable technologies, smart home appliances, and security systems, among others

69. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic devices and electronically stored information that reasonably could contain records and information described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may involve techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the medium to inspection to identify items that are seizable under the warrant.

70. In addition to the information provided above, I submit that there is probable cause to believe that records and information described in Attachment B are likely to be stored on electronic devices found on the **Target Premises**, and may be identified through forensic examination, for reasons including the following:

a) Based on my knowledge, training, and experience, I know that electronic files and information and remnants of files and information can be recovered months or even years after they have been stored on or deleted from an electronic device or viewed via the Internet. Information can be stored at little or no cost. Even when information has been deleted, it sometimes can be recovered months or years later using forensic tools. This is so because, typically, when a person "deletes" a file or information, the operating system may not immediately erase the data; instead, the system may instead remove the pointer or reference that links the file's location within the device's storage medium. Some or all of the deleted data may then remain on the storage medium until it is overwritten by new data.

b) Additionally, in modern operating systems, a piece of information (e.g., text message, notification, photo, or location coordinates) may be written to several locations on the

electronic device. When the primary item (e.g., a text message) is deleted, the other copies of the data may be unaffected and remain long after the deletion of the primary item.

c) In addition to user-generated files, electronic devices contain records that can help demonstrate how the device was used, what it was used for, and who has used it. Operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or page files can all be useful in answering such questions. Some of this information is routinely recorded by the operating system or by applications as part of a device's normal functioning. Electronic device users typically do not erase or delete this evidence, because specialized software is usually required for that task.

d) Additionally, most current operating systems (such as iOS, Android, and Microsoft Windows), as well as individual applications, routinely include features that utilize cloud services to synchronize data across multiple electronic devices linked to the same user account or service. These synchronization features—often enabled by default—can provide access to files, internet activity, photos, emails, text messages, and other forms of electronically stored information from any of the user's electronic devices. For example, when an iPhone user takes a photograph with their phone, the photo can be nearly instantaneously synchronized across all their linked Apple devices (e.g., iPad, laptop, desktop) that are connected to the same Apple account. This synchronization functionality means that evidence within the parameters of Attachment B created on one device but subsequently deleted may still reside on other electronic devices if those devices have not yet received or processed the deletion signal or synchronized the update.

e) Based on the review of other evidence related to this investigation, including receipts from Ria Money Transfer and Western Union, I am aware that electronic devices

were used to generate, store, and/or print documents used in the drug trafficking scheme. There is reason to believe that there are electronic devices currently located on the **Target Premises**.

71. Forensic evidence. As further described in Attachment B, this application seeks permission to search for and to seize both records that serve more directly as evidence of the Target Offense(s) and forensic electronic evidence that establishes how electronic devices storing any such records were used, the purpose of their use, who used them, and when, as is relevant to the records described previously. Forensic electronic evidence also can help to identify and locate additional evidence of the Target Offense(s). There is probable cause to believe that such forensic electronic evidence will be on electronic devices in the **Target Premises** because:

a) Data on the electronic device can provide information about a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs, among others, store configuration information that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic device was in use. Electronic device file systems can sometimes record information about the dates files were created and the sequence in which they were created.

72. Additionally, some information stored on an electronic device may provide evidence relating to the physical location of other evidence or suspects. For example, an image stored on a device may have geolocation information incorporated into its file data. Such file data also may contain information indicating when the file or image was created. Information from such image files, along with external device connection logs, may also indicate the use of

additional electronic storage media that may contain evidence of the Target Offense(s) (e.g., a digital camera or cellular phone with an incorporated camera).

73. Additionally, information stored on an electronic device may provide relevant insight into the device user's state of mind as it relates to the Target Offense(s). For example, information on the electronic device may indicate the user's motive and intent to commit drug trafficking (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement)

74. As explained herein, based on my training and experience, I know that certain file types, artifacts, automatic processes, logs, and deleted information may require the use of additional forensic and contextual analysis to: (a) evaluate whether forensically recovered information falls within the parameters of Attachment B and (b) identify and understand both inculpatory and exculpatory information on the electronic device.

75. Timestamps, compound files, and databases: I know through my training and experience and my communications with forensic experts that different electronic device operating systems and programs use multiple "timestamps" for information stored within devices. As further described below, these timestamps can be altered by automated processes. Because electronic devices employ timestamps to facilitate the functioning of the operating system or program, the timestamps for a particular file may present in idiosyncratic ways that require further analysis to understand. For example, operating system and application updates for electronic devices can change timestamps for information stored on the electronic device and can alter where information is stored on the device and the directories and databases associated with the information.

76. Also based on my training and experience and my communications with forensic experts, I know that electronic devices can contain databases and other compound files. A database or a compound file, such as a .rar or .zip file, will have timestamps for the container file, but also may contain many other files, data or logs, each with additional timestamps. I know that additional forensic and contextual analysis is often necessary to understand whether information contained in databases and compound files falls within the parameters of Attachment B.

77. Information for which no timestamps exist: Additionally, some information in current operating systems is often stored in formats that lack timestamps. For example, as discussed above, when information is deleted from an electronic device, current operating systems do not immediately erase the data. I understand that, depending on the operating system and electronic device, timestamps associated with deleted information may have changed or have been removed when that information was deleted. Advanced forensic tools and contextual investigation may help analysts and investigators understand whether deleted information that is forensically recovered falls within the parameters of Attachment B.

78. User attribution information: In my training and experience, information stored on an electronic device (e.g., registry information, communications, images and videos, transactional information, records of session times and durations, internet history, anti-virus, spyware, and malware detection programs) can provide information about the use and control of the electronic device that is relevant to the Target Offense(s) and the authentication of evidence stored on the electronic device. This "user attribution" information can provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

79. User attribution evidence for electronic devices can be closely akin to evidence showing "indicia of occupancy" in the context of the execution of a residential search warrant. Information about the use or control of an electronic device can be highly relevant evidence in a criminal investigation.

80. Electronic device activity can indicate who used, owned, or controlled the device at times that are relevant to the Target Offense(s). For example, as described herein, many electronic devices contain logs of user account session times and durations, device activity associated with user accounts, electronic storage media that connected with the device, and the IP addresses through which the electronic device accessed networks and the Internet. Such information can inform the chronological context of electronic device access, use, and events relating to the investigation of the Target Offense(s). In addition to showing use and control of the electronic device, such user-attribution information can be relevant to authenticating evidence obtained from the device. Similarly, the existence or absence of anti-virus, spyware, and malware detection programs may be used to explain the likelihood that the computer was remotely accessed, addressing claims of how a record got on the electronic device.

81. Some types of information that can be strongly indicative of use or control of an electronic device include:

a) Set up or registry information. I know in my training and experience that when users purchase or acquire an electronic device, as part of the device set up, the user will typically enter their name, a "recovery" email address, an associated account if any (e.g., an Apple account (for iPhones or other devices that use the iOS operating system), Google account (for Android cellular phones), or a Microsoft account (for a device running Windows)), country, time zone, language, and sometimes an associated credit card number.

b) In addition, in my training and experience, I know that electronic device users typically modify the “wallpaper,” “home screen,” or “desktop” of electronic devices soon after acquiring the devices. Second, I know in my training and experience that electronic device users often customize the “wallpaper,” “home screen,” or “desktop” of electronic devices with images of themselves, or other persons, places, or things that are important to the device user. Such images are typically visible every time the user accesses the electronic device and are strongly indicative of use and control.

c) The “contacts” or “address book” on an electronic device can be strongly indicative of who uses and controls the device. Such contacts are often set up as soon as the user acquires the device (sometimes automatically by the vendor, through synchronization with an existing account, or through another process (e.g., “Airdrop” with iPhones)) and are added to incrementally over time.

82. I know that when an individual uses an electronic device to commit drug trafficking, the individual’s electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to engage in criminal activity of the kind described above may contain: data that is evidence of how the device was used; data that was sent or received; information as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

83. Necessity of seizing or copying entire electronic devices. In many cases, a thorough search of a premises for information that might be stored on electronic devices will

require the physical seizure or copying of electronic devices and later off-site review consistent with the warrant. In lieu of removing electronic devices from the premises, it is sometimes possible to make a copy or forensic image of electronic devices. Forensic imaging can often take a comprehensive electronic picture of the computer's data, including hidden sectors and deleted files. Similarly, an extraction of a cell phone can often make an extensive copy of the cell phone's data. Either physical seizure of or copying data from an electronic device is often necessary (in addition to or instead of on-site review) because these techniques help to enable the review of data stored on the electronic device and prevent the loss of the data from either accidental or intentional destruction. This is true because of the following:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed and analyzed on site in a timely manner. Analyzing evidence of how an electronic device has been used, what it has been used for, and who has used it may require considerable time, and taking that much time on premises could be inefficient or even unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine electronic devices with special tools and expertise, and potentially for a substantial amount of time, to obtain such evidence. Electronic devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and possibly unduly intrusive to attempt on site.

b) Technical requirements. Electronic devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic devices available makes it difficult to

know before a search what tools or knowledge will be required to search for evidence on electronic devices at the Premises. However, taking the electronic device off site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site review using specialized forensic tools.

84. Because several people share the **Target Premises** as a residence, it is possible that the **Target Premises** will contain electronic devices that are predominantly used, and perhaps owned, by persons who are not suspected of the Target Offense(s). If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those electronic devices, the warrant applied for would permit the physical seizure and/or copying and review of those items as well.

**FORFEITURE**

85. This application requests the issuance of a warrant under 21 U.S.C. § 853(f) authorizing the seizure of property subject to forfeiture. This is appropriate because: (1) there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, and (2) an order issued at a later date under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture. In particular, there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture because 18 U.S.C. § 853(a) provides that "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation" and "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation" shall be forfeited to the United States.

**CONCLUSION**

86. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the location described in Attachment A. I respectfully request that this Court issue search warrants for the location described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

Respectfully submitted,

*/s/ Michael McGee* DLC
Michael McGee
Task Force Officer
Federal Bureau of Investigation

SWORN to telephonically in accordance with Fed. R. Crim. P. 4.1 on this date of
3 November, 2026.

HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS